[No. 1885–3. Division Three. November 30, 1977.]

ALCORN TRAILER CITY, INC., *Respondent,* v. BEATRICE
BLAZER, *Individually and as Executrix,*
*Appellant.*

*Roland C. Wightman,* for appellant.

*Joseph P. Delay* and *Delay, Curran & Boling,* for respondent.

GREEN, J.—Plaintiff–lessee, Alcorn Trailer City, Inc., brought this action seeking reformation and specific performance of a lease–option agreement against the defendant–lessor, Beatrice Blazer, individually and as executrix of the estate of Elizabeth Kish, deceased. From a decree of reformation and specific performance, defendant appeals, assigning error to several findings of fact and conclusions of law.

In 1971, the defendant acquired title through her mother's estate to certain real property in Spokane, improved by a commercial–type building constructed in 1964. Defendant's mother had continuously carried fire insurance on this building and upon her death, defendant continued to pay the premiums on the policy. It was renewed in August 1974, shortly before defendant executed the lease–option agreement in issue in this case.

The first involvement between the parties to this action occurred on February 23, 1971, when defendant leased the premises to plaintiff for a term of 2 years with an option to purchase the property for $80,000 at the expiration of the lease. The lease provided *inter alia:*

> Lessee agrees to maintain fire insurance coverage during the term of this lease and in addition to maintain personal property and personal injury liability coverage on the premises and to furnish lessor a copy of said policies.

According to plaintiff, he secured a liability policy and gave a copy to defendant at her request, but he did not obtain fire insurance coverage and the defendant never requested a copy of such policy. Defendant testified that she never requested or received a copy of any of the policies. In fact, defendant claims they had no discussion concerning insurance during the term of that lease.

After the 1971 lease expired, plaintiff remained on the premises under a month–to–month tenancy until late

August 1974. At that time the parties agreed to enter into a new lease–option agreement for a term of 1 year beginning September 1, 1974, upon the same terms as the former lease–option. They agreed that plaintiff would pay the unpaid July and August rent and the first and last months' rent under the new lease. Thereupon, defendant requested her attorney[1] to prepare a new lease–option agreement upon the same terms as the former one.

On August 28, defendant went to her attorney's office, read, approved and signed the lease–option agreement. She then went to plaintiff's office and informed him that she had signed the new lease and it was ready for his signature. At that time, defendant received the agreed rental payments from the plaintiff.

On September 3, plaintiff went to the attorney's office to read and sign the lease. However, he objected to two provisions. The first related to insurance and reads as follows:

(12) Lessee shall procure and maintain fire insurance coverage on the premises during the term of this lease. Should the premises be damaged or destroyed by fire or other casualty to the extent the same are not tenantable, then lessee shall repair or rebuild the same as soon as reasonably practicable, rent to abate during any period of untenantability.

Plaintiff testified he told the attorney that he never carried fire insurance under the old lease and he would not sign the new lease with that provision in it. At that point, according to plaintiff's testimony, the attorney told him to cross it out and initial it, which he did. The attorney testified that plaintiff indicated the same provision in the former lease "was never followed by Mrs. Blazer and myself because Mrs. Blazer always carried the fire insurance." When asked to strike the provision, the attorney stated, plaintiff was told to do so if he wished and that he (the attorney) "would thereafter take it up with Mrs. Blazer." The attorney also testified that there was no discussion as to who was going to

---

[1]Defendant's present counsel at trial and on appeal was not involved in the preparation or execution of the lease–option agreements.

carry insurance, simply "Mr. Alcorn [plaintiff] had said that Mrs. Blazer [defendant] had always carried it and therefore he would not."

Plaintiff's second objection to the agreement related to a provision prohibiting him from subletting any portion of the premises. Plaintiff testified he told the attorney that he and the defendant had discussed arrangements for subletting a portion of the premises to Charles Tourttollotte and defendant had agreed to it. At plaintiff's request, the attorney inserted the following typewritten sentence at the end of paragraph (7) of the lease:

> Lessor understands that arrangements are being made with Charles Tourttollote for rental of a portion of the premises.

After these two changes, plaintiff signed the lease on September 3, 1974.

The attorney testified that on September 4, he telephoned defendant and informed her of the deletion of the provision requiring plaintiff to carry fire insurance and asked if she agreed. He also asked her if she wanted him to mail the lease to her the way it was or retain it subject to further negotiations. He testified:

> I don't know what she said in response to that, quite frankly, but I do know that I did mail her the lease. . . . I don't recall what she told me when I asked her what she wanted to do about Mr. Alcorn's striking the fire provision in the lease.

He stated that defendant did indicate she had carried fire insurance on the premises in the past. He testified that a copy of the lease was mailed to both parties on September 4, 1974, and that he would not have mailed the lease had she objected to the changes. The attorney did not believe he discussed the Tourttollotte change with the defendant, although he intended to do so. Neither party contacted him concerning the provisions of the lease after it was mailed.

Defendant's version of the transaction varied from that of her attorney, as she testified that she never received a telephone call concerning the changes. She acknowledged

receipt of a copy of the lease in the mail on September 5 and stated she thumbed through it and noticed the insurance change. She then telephoned her attorney who explained that plaintiff told him they had a separate agreement about Mr. Tourttollotte and the fire insurance. Defendant testified she said nothing more but "hung up because that was the end of him representing me when he makes a change." She also testified that she never tried to call plaintiff and tell him she would not agree to the changes since "I didn't initial it [the change], . . . I didn't agree to it." Defendant stated that when she signed the lease, it was her understanding both parties would carry fire insurance; it was natural, that she would carry it; and although she knew plaintiff had stricken the provision, she never said anything to him about it. Defendant acknowledged receipt of the October rent *after* she knew of the deletion. With respect to subletting by Mr. Tourttollotte, defendant stated that when plaintiff mentioned it, she said, "You're renting this property and you're totally responsible whatever happens to it." Defendant claims she never said "yes" or "no" to subletting.

Plaintiff paid the October rent to defendant and on Friday, November 1, plaintiff's secretary made out the November rental check but apparently did not get it mailed on that day. About 1:30 a.m. on Saturday, November 2, the building and its contents were destroyed by fire.

During the week following the fire, plaintiff testified, he learned from defendant that the building was insured for $40,000. He also learned that defendant had not received the November rent check and concluded it must have been burned in the fire. He informed defendant that he would make out a new check for the November rent. Plaintiff testified that subsequent to this conversation, he telephoned defendant to find out whether she had heard from her insurance company and if the building would be rebuilt. At that time plaintiff told her to keep track of the insurance because he would exercise the option and deduct the insurance from the purchase price, explaining that this way he

could either remove or repair the building and resume his business.

Shortly thereafter, the parties met at plaintiff's place of business. Plaintiff offered defendant the replacement November check and orally advised her that he would exercise the option and pay the difference between the option price of $80,000 and the proceeds received from her insurance coverage. This offer was rejected. Thereafter, plaintiff gave written notice of the exercise of the option, including the deduction to the extent of the insurance proceeds. Defendant received $40,000 from the insurance but refused to recognize plaintiff's attempted exercise of the option.

This action was then commenced. Following a trial to the court, plaintiff was granted specific enforcement of the option. The court found that the defendant "was to carry the fire insurance policy on the improvements . . . for the benefit of the lessee and secondarily for herself so that she would be insured at least partial payment in the event of destruction of the improvements on the property." The court further found that "at least on the part of the defendant Blazer by estoppel . . . it was intended that the defendant Beatrice Blazer, would maintain fire insurance coverage on the building leased herein, and that she would pay the premium thereon." The court reformed the contract in accordance with the findings and concluded that the purchase price should be reduced by the amount of $40,000, the insurance proceeds received by defendant. It also determined that since the purchase could not be completed until the lease term expired, defendant should be awarded the amount of the rent due for the balance of the lease. From these findings, conclusions and decree, defendant appeals.

Defendant asserts that (1) she intended both parties carry insurance to protect their own interest and hence the provision that plaintiff carry insurance, repair and replace the building in event of fire; (2) when this requirement was stricken without her consent, it left the lease void of any

insurance provision; and (3) she carried insurance solely for her own benefit. Further, defendant contends plaintiff owned no interest in the property and, hence, could have no interest in her insurance proceeds since the option was not exercised until after the improvement was destroyed by fire.

Here, the evidence which could have been believed by the trial court shows that plaintiff objected to the fire insurance provision because (1) it was not followed under the old lease, and (2) defendant always carried fire insurance. After this provision was deleted, plaintiff signed the lease and understood that the attorney would take it up with the defendant. Defendant acknowledged that she was informed of the deletion and the reason given by plaintiff. While defendant's attorney could not recall her exact reply, he said he would not have mailed the lease if she had objected to the deletion. It is undisputed that neither the defendant nor her attorney ever told plaintiff that the deletion was not approved. Well after the deletion, plaintiff accepted payment of the October rent. It was not until after the fire that plaintiff learned that defendant did not approve of the deletion.

It is a reasonable inference from this evidence that the parties intended that fire insurance be carried by one of them to preserve the improvements which were the subject of the lease–option agreement. Defendant told her attorney to prepare a new lease–option agreement according to the terms of the old lease. This the attorney did, not being aware of the fact that the insurance provision in the former lease had not been enforced. When defendant failed to communicate any objection to either her counsel or plaintiff regarding the deleted provision, but instead accepted subsequent rent, the reasonable inference is that fire insurance was being carried by defendant for the purpose of preserving the improvements. Since both parties had an interest in protecting the improvements, the insurance was for the benefit of both plaintiff and defendant.

■ On these facts the trial court found that defendant was estopped to contend otherwise. We agree. In *Kessinger v. Anderson,* 31 Wn.2d 157, 170, 196 P.2d 289 (1948), the court said:

> To constitute estoppel *in pais,* three things must occur: (1) An admission, statement, or act inconsistent with the claim afterwards asserted; (2) action by the other party on the faith of such admission, statement, or act; and (3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement, or act.

These elements are satisfied under the evidence in this case. Defendant's conduct affirmed plaintiff's understanding that defendant's insurance would protect the improvements. He reasonably relied upon this conduct in proceeding under the lease. To allow defendant to repudiate, after the fire, the reasonable implication of her conduct would result in injury to plaintiff unless the subject matter is restored. Thus, there is substantial evidence to support the trial court's determination that the insurance was for the benefit of both parties and that defendant is estopped to contend otherwise.

■ It follows from the findings and conclusions that plaintiff's exercise of the option to purchase should be specifically enforced.[2] The proceeds of the fire insurance stand in place of the improvements and are properly applied to reduce the purchase price. Defendant receives the benefit of her bargain in that she will receive the full option price of $80,000. *See Carnation Lumber & Shingle Co. v. Tolt Land Co.,* 103 Wash. 633, 642, 175 P. 331 (1918), where the court noted in a similar situation:

> [E]quity will take no account of a change in form or character of property. This works complete equity between parties to this suit, for it gives to the purchaser

---

[2]Defendant also argues that the option cannot be validly exercised because plaintiff failed to comply with the conditions precedent, *i.e.,* not subletting without written consent and timely payment of the November rent. However, these facts were determined by the trial court contrary to defendant's assertions and are supported by substantial evidence.

his value in property, and with the payment of the money into the registry of the court, the bank will satisfy the contract and give to the purchaser and the land company all that it demanded.

While in *Carnation* the contract contained an express provision for allocation of insurance and in that sense differs from the instant case, in principle they are the same because here the trial court found that it was the intent of the parties that defendant carry fire insurance for their benefit. In these circumstances, we need not resolve the issues that would arise from a lease–option agreement where there is no provision or evidence relative to insurance. *See* Annot., *Right to Proceeds Of Insurance, as Between Holder of Title to Real Estate and One Having Option to Purchase It,* 65 A.L.R.2d 989 (1959).

Affirmed.

MUNSON, C.J., and McINTURFF, J., concur.

Petition for rehearing denied February 2, 1978.